## GLAVEY *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 235. Argued April 11, 12, 1901.—Decided May 27, 1901.

When an office with a fixed salary has been created by statute, and a person duly appointed to it has qualified and entered upon the discharge of his duties, he is entitled, during his incumbency, to be paid the salary prescribed by statute.

Such an appointment is complete when duly made by the President and confirmed by the Senate, and the giving of a bond required by law is a mere ministerial act for the security of the Government, and not a condition precedent to his authority to act in performance of the duties of the office.

As the act of 1882 created a distinct, separate office, with a fixed annual salary for the incumbent, to be paid by the Secretary of the Treasury; as the plaintiff was legally appointed thereto, by the Secretary under and by virtue alone of that act; and as he entered upon the discharge of the duties appertaining to that position, he was entitled to demand the salary attached by Congress to the office.

THE case is stated in the opinion of the court.

*Mr. Robert D. Benedict* for appellant. *Mr. E. S. Mussey* was on his brief.

*Mr. Assistant Attorney General Pradt* for the United States. *Mr. Felix Brannigan* was on his brief.

.. MR. JUSTICE HARLAN delivered the opinion of the court.

· This action was brought May 22, 1897, to recover from the United States the sum of $6011.98, which amount the plaintiff Glavey, who was formerly a local inspector of vessels at New Orleans, alleged that he was entitled to receive for services performed by him as a special inspector of foreign steam vessels at the same city, at the rate of two thousand dollars per annum from May 25, 1891, to May 27, 1894.

The Court of Claims dismissed the petition. The majority of that court were of opinion that under the terms of his appointment the plaintiff was precluded from demanding compensation for any services performed by him as special inspector of foreign steam vessels. The minority were of opinion that the statute having fixed the salary of a special inspector of foreign steam vessels, it was beyond the power of the Secretary, in whom was vested the power of appointment, to prescribe as a condition of the plaintiff's appointment that he should serve as such special inspector without compensation beyond that received by him as a local inspector. 35 C. Cl. 242.

By section 4400 of the Revised Statutes of the United States, Title " Regulation of Steam Vessels," as the revision stood prior to August 7, 1882, it was provided : " All steam vessels navigating any waters of the United States which are common highways of commerce, or open to general or competitive navigation, excepting public vessels of the United States, vessels of other countries, and boats propelled in whole or in part by steam for navigating canals, shall be subject to the provisions of this Title."

Section 4415 of the same title relates to local boards of inspectors and the appointment of local inspectors.

Section 4400 was amended and enlarged by the act of Congress approved August 7, 1882, c. 441, by adding at the end of

that section these words: "And all private foreign steam vessels carrying passengers from any port of the United States to any other place or country shall be subject to the provisions of sections 4417, 4418, 4421, 4422, 4423, 4424, 4470, 4471, 4472, 4473, 4479, 4482, 4488, 4489, 4496, 4497, 4499 and 4500 of this Title, and shall be liable to visitation and inspection by the proper officer, in any of the ports of the United States, respecting any of the provisions of the sections aforesaid." 22 Stat. 346.

By that act it was further provided that for the purpose of carrying into effect its provisions "the Secretary of the Treasury shall appoint officers to be designated as special inspectors of foreign steam vessels, at a salary of two thousand dollars per annum each, and there shall be appointed of such officers at the port of New York, six; at the port of Boston, two; at the port of New Orleans, two; and at the port of San Francisco, two," § 2; that "the special inspectors of foreign steam vessels shall perform the duties of their office and make reports thereof to the Supervising Inspector General of Steam Vessels, under such regulations as shall be prescribed by the Secretary of the Treasury," § 3; that "each special inspector of foreign steam vessels shall execute a proper bond, to be approved by the Secretary of the Treasury, in such form and upon such conditions as the Secretary may prescribe, for the faithful performance of the duties of his office," § 4; that "the Secretary of the Treasury shall procure for the several inspectors heretofore referred to such instruments, stationery, printing, and other things necessary, including clerical help, where he shall deem the same necessary for the use of their respective offices, as may be required therefor," § 5; and that "the salaries of the special inspectors of foreign steam vessels and clerks provided for, together with their traveling and other expenses, when on official duty, and all instruments, books, blanks, stationery, furniture, and other things necessary to carry into effect the provisions of this act, shall be paid for by the Secretary of the Treasury, out of any moneys in the Treasury not otherwise appropriated," § 6. 22 Stat. 346.

The judgment of the Court of Claims was based upon a finding of facts which is here given in full:

" I. The claimant, a citizen of the United States, residing at New Orleans, La., was, on the 17th day of April, 1891, duly appointed, pursuant to Revised Statutes, section 4415, to the office of local inspector of hulls of steam vessels, for the district of New Orleans, La., and on April 21, 1891, he accepted said appointment and duly qualified by taking the prescribed oath of office and by forwarding the same together with the official bond prescribed by law therefor to the Treasury Department. He then and there entered upon the discharge of his duties and continued to discharge the same until May 27, 1894. During the claimant's incumbency of said office he claimed each month the salary thereof by rendering his accounts therefor, which were promptly paid by the defendants.

" II. The report of the supervising inspector general for the fiscal year ending June 30, 1889, recommended:

" ' That sections 2 to 6, inclusive, of the amendment to section 4400, Revised Statutes, which provides a separate set of officers and clerks for the inspection of foreign steam vessels, be repealed, the reasons for the creation of such offices having ceased to exist upon the passage of the act approved June 19, 1886, which abolished the fees formerly collected from domestic steam vessels and their licensed officers, which fees were permanently appropriated previously for the support of the domestic inspection service and which could not legally be diverted therefrom for the support of officers and clerks inspecting foreign steam vessels, from whom no fees could legally be collected for such support. The action of Congress in the matter of creating the separate offices was based on the reasons given in the following extract from the special report of the supervising inspector general, dated January 21, 1882: ". . . Authority should be given the Secretary of the Treasury to appoint these special inspectors and to pay their salaries, . . . per annum, and necessary traveling expenses, from funds appropriated from moneys in the Treasury not otherwise appropriated, as it would seem obviously improper that such special officers should be paid from the appropriation for the salaries and expenses of steam-

boat inspection from funds collected by a tax on American steamboat owners and the licensed officers of such vessels." As the officers and clerks of both services are now paid from funds in the general Treasury, the advantage of uniting the two services must be clearly obvious, both as to public interests and economy in conducting the service. In the latter respect a saving can be made of all the salaries now being paid, except at the port of New York, where two of the officers and the clerk might be retained by transfer to the domestic service, dispensing with the services of the other two now employed. The inspectors at San Francisco, Boston, Philadelphia, Baltimore and New Orleans could be dispensed with altogether, thereby saving to the Government the sum of $14,000 annually, the total of salaries now paid those officers. The additional work that would fall upon the domestic service by such dispensation would be as follows: At New York, 138 steamers; San Francisco, 11; Boston, 18; Portland, Me., 7; Philadelphia, 8; Baltimore, 10; Port Huron, 3; Marquette, 11; Buffalo, 8; Oswego, 22; Burlington, Vt., 3; Detroit, 2; New Orleans, 16. Total steamers, 257.'

" III. By the finance report of the Secretary of the Treasury to the Speaker of the House of Representatives, first session Fifty-first Congress (1889), it was recommended 'that all laws be repealed which provide a separate establishment for the inspection of foreign steam vessels, and that the inspectors of domestic steam vessels be authorized and required to perform all necessary services in connection with the inspection of foreign steamships. The offices proposed for abolition are virtually sinecures, and until they are abolished the Executive will remain subjected to importunity to fill them. The services of three of these officers have been dispensed with.' The three offices disposed of were those at San Francisco, Cal., New Orleans, La., and Philadelphia, Pa.

"IV. While the claimant was holding the office aforesaid, to wit, May 25, 1891, he received from the Secretary of the Treasury a communication, of which the following is a true copy, viz.: 'Treasury Department, Office of the Secretary, Washington, D. C., May 15, 1891. Mr. John Glavey, New

Orleans, Louisiana. Sir: Under the provisions of an act of Congress, approved August 7, 1882, entitled 'An act to amend section 4400 of title LII of the Revised Statutes of the United States, concerning the regulation of steam vessels,' you are hereby appointed to serve in connection with your appointment as local inspector of hulls of steam vessels, as a special inspector of foreign steam vessels, without additional compensation, for the port of New Orleans, Louisiana, the appointment to take effect from date of oath. Respectfully yours, Charles Foster, Secretary.'

" V. May 25, 1891, the claimant took the oath therein referred to, which was in the usual form of an oath of office, and transmitted the same to the Secretary of the Treasury on that date. He was not required to and did not give or offer to give the bond prescribed by statute for the office of special inspector of foreign steam vessels. From the time of taking the oath aforesaid until May 27, 1894, the claimant performed the duties of a special inspector of foreign steam vessels at said port.

" VI. During the time the claimant was performing the duties of special inspector of foreign steam vessels, as aforesaid, he made no request or demand upon the Secretary of the Treasury or any other officer of the defendants, to be paid the salary prescribed by law for the incumbent of the office of special inspector of foreign steam vessels at said port, nor did he when he subscribed the oath as aforesaid; nor did he at any time thereafter while he held said office of local inspector of hulls of steam vessels, for which he was paid as aforesaid, make to the Secretary of the Treasury or to any other officer of the Government any protest or objection whatever to the performance of the duties of special inspector of foreign steam vessels in connection with his appointment as local inspector of hulls of steam vessels at said port without additional compensation.

" VII. Prior to the time the claimant ceased to perform the services aforesaid he received from the acting Secretary of the Treasury a communication of which the following is a true copy: 'Treasury Department, Office of the Secretary, Washington, D. C., December 15, 1893. Mr. John Glavey, inspector of hulls of steam vessels, New Orleans, La. Sir: Department

letter of the 7th instant requesting you to tender your resignation as inspector of hulls of steam vessels for the tenth district is hereby revoked, and you are requested to tender your resignation as inspector of hulls of steam vessels for the district of New Orleans, La., also as special inspector of foreign steam vessels for the port of New Orleans, La., to take effect upon the appointment and qualification of your successor. Respectfully yours, W. E. Curtis, Acting Secretary.' Thereafter he received from the acting Secretary another communication, of which the following is a copy: 'Treasury Department, Office of the Secretary, Washington, D. C., April 14, 1894. Mr. John Glavey, inspector of hulls of steam vessels, New Orleans, La. Sir: Your services as inspector of hulls of steam vessels for the district of New Orleans, La., are hereby discontinued, to take effect upon the appointment and qualification of your successor. Respectfully yours, S. Wike, Acting Secretary.' And, thereafter, May 28, 1894, the claimant's duly appointed and qualified successor as local inspector of hulls of steam vessels entered upon the discharge of the duties of said office, after which the claimant ceased to perform the duties of said office. The claimant performed the duties of said office as special inspector of foreign steam vessels until said May 26, 1894, a period of three years and two days."

The learned Assistant Attorney General admits it to be a general principle that when an office with a fixed salary has been created by statute and a person duly appointed to it has qualified and entered upon the discharge of his duties, he is entitled during his incumbency to be paid the salary prescribed by statute. He insists, however, that this principle is not applicable in the present case because, he contends, the Secretary of the Treasury did not mean, by his letter or communication of May 15, 1891, to appoint Glavey to the office of special inspector of foreign steam vessels at the port of New Orleans.

We cannot sustain this contention. Section 4400 of the Revised Statutes was so amended by the act of August 7, 1882, as to bring foreign steam vessels within the provisions of certain other specified sections; and by the same act, and for the purpose of carrying its provisions into effect, the Secretary of the

Treasury was directed to appoint special inspectors of foreign steam vessels at designated ports, one of which was the port of New Orleans. In view of the express words of the act, his failure or refusal to appoint might have been regarded as a failure or refusal to discharge a duty distinctly imposed upon him by statute. And that seems to have been the view of that officer, for although he had officially declared to Congress that the office of special inspector of foreign steam vessels was virtually a "sinecure," he shows by his communication of May 15, 1891, that he regarded the act of August 7, 1882, as mandatory, and that he appointed Glavey in obedience to its provisions. As he had no authority to appoint Glavey except in virtue of that act, we cannot assume that he proceeded or intended to proceed outside of its provisions. We must take it that he meant just what he plainly and expressly declared, and consequently that he intended, in virtue of the authority given by the act of 1882, to appoint Glavey to the office of special inspector of foreign steam vessels at New Orleans.

The next contention of the Government is that if the communication of May 15, 1891, is to be taken as showing a valid appointment to the office in question, Glavey did not legally qualify as special inspector in that he did not give or tender the bond prescribed by section 4 of the act of 1882; consequently, it is argued, he was at most only an officer *de facto.*

Is it true that the execution of the required bond was necessary in order that Glavey could lawfully proceed in the discharge of the duties of the office to which he was appointed?

Some light is thrown upon this question by *United States* v. *Bradley,* 10 Pet. 343, 357, 364. That was an action upon a bond of one who acted as paymaster in the army. The act under which the bond was taken provided that "all officers of the pay, commissary and quartermaster's department, shall, previous to entering on the duties of their offices, give good and sufficient bonds to the United States, fully to account for all moneys and public property which they may receive, in such sum as the Secretary of War shall direct." 3 Stat. 298, c. 69, § 6. This court, speaking by Mr. Justice Story, after observing that the proper officers of a department to which the

disbursement of public moneys was entrusted could take a valid bond to secure the Government in respect of such moneys, said: " Before concluding this opinion, it may be proper to take notice of another objection raised by the third plea, and pressed at the argument. It is that Hall was not entitled to act as paymaster until he had given the bond required by the act of 1816, in the form therein prescribed; and that not having given any such bond, he is not accountable as paymaster for any moneys received by him from the Government. We are of a different opinion. Hall's appointment as paymaster was complete when his appointment was duly made by the President and confirmed by the Senate. The giving of the bond was a mere ministerial act for the security of the Government, and not a condition precedent to his authority to act as paymaster. Having received the public moneys as paymaster, he must account for them as paymaster."

The doctrine announced in that case was reaffirmed in *United States* v. *Linn*, 15 Pet. 290, 313, which was an action upon a writing obligatory given by a receiver of public moneys in a certain land office. The case came before this court upon questions in respect of which the judges of the Circuit Court were divided. Those questions were: 1. Whether the obligation of the receiver and his sureties, being without seal, was a bond within the act of Congress of May 10, 1800, which provided that a receiver of public moneys for lands of the United States " shall, before he enters upon the duties of his office, give bond, with approved security . . . for the faithful discharge of his trust." 2 Stat. 73, 75, c. 55, § 6. 2. Whether such an instrument was good at common law. The court, speaking by Mr. Justice Thompson, and referring to the emoluments which the receiver was entitled to have, said: " These emoluments were the considerations allowed him for the execution of the duties of his office; and his appointment and commission entitled him to receive this compensation, whether he gave any security or not. His official rights and duties attached upon his appointment. This was so held by this court in the case of *United States* v. *Bradley*, 10 Pet. 364." After stating what had been decided in that case, the court proceeded: " Accord-

ing to this doctrine, which is undoubtedly sound, Linn was a receiver *de jure,* as well as *de facto,* when the instrument in question was given."

In *United States* v. *Le Baron,* 19 How. 73, 78, the question was as to the time when a person nominated and confirmed as a deputy postmaster, and whose commission was put into the hands of the Postmaster General for delivery to the appointee, was to be deemed to have been invested with such office. This court, speaking by Mr. Justice Curtis, said : "When a person has been nominated to an office by the President, confirmed by the Senate, and his commission has been signed by the President, and the seal of the United States affixed thereto, his appointment to that office is complete. Congress may provide, as it has done in this case, that certain acts shall be done by the appointee before he shall enter on the possession of the office under his appointment. These acts then become conditions precedent to the complete investiture of the office ; but they are to be performed by the appointee, not by the Executive ; all that the Executive can do to invest the person with his office has been completed when the commission has been signed and sealed ; and when the person has performed the required conditions, his title to enter on the possession of the office is also complete."

It may be here observed that the above cases are stronger than the present case in that the act of 1882 contained no provision requiring a special inspector of foreign steam vessels to execute a bond before entering on the duties of his office. We observe also that the principles announced in the *Bradley* and *Linn* cases were recognized in *United States* v. *Eaton,* 169 U. S. 331.

In view of the former decisions of this court, it cannot be held that the execution by Glavey of the bond required by the act of 1882 was a condition precedent to his right to exercise the functions of the office to which he was appointed by the Secretary of the Treasury. Congress did not so direct. His appointment was complete, at least, when he took the required oath and transmitted evidence of that fact to the Secretary. After taking the oath, evidencing thereby his acceptance of the

appointment, he was entitled to proceed in the execution of the duties of his office and became liable for any failure to properly discharge them.

It remains to inquire whether, by reason of the statement in the Secretary's letter of communication of May 15, 1891, that the appointment in question was "without additional compensation" beyond that received by the appointee as local inspector of hulls of steam vessels, Glavey was estopped to demand the salary fixed by the act of 1882 for special inspectors of foreign steam vessels.

In *United States* v. *Symonds*, 120 U. S. 46, 49, the question was whether certain services were performed "at sea" within the meaning of section 1556 of the Revised Statutes fixing the pay of lieutenants in the navy when at sea, or when on shore duty, or when on leave or waiting orders. Symonds claimed that the services for which he sued were performed "at sea," and that he was entitled to the compensation fixed by the statute for services of that kind. This court said: "If the regulations of 1876 had not recognized services 'on board a practice ship at sea' as sea services, the argument on behalf of the Government would imply that they could not be regarded by the courts, or by the proper accounting officers, as sea services; in other words that the Secretary of the Navy could fix, by order and conclusively, what was and was not sea service. But Congress certainly did not intend to confer authority upon the Secretary of the Navy to diminish an officer's compensation, as established by law, by declaring that to be shore service which was in fact sea service, or to increase his compensation by declaring that to be sea service which was in fact shore service. The authority of the Secretary to issue orders, regulations and instructions, with the approval of the President, in reference to matters connected with the naval establishment, is subject to the condition, necessarily implied, that they must be consistent with the statutes which have been enacted by Congress in reference to the navy. He may, with the approval of the President, establish regulations in execution of, or supplemental to, but not in conflict with, the statutes defining his powers or conferring rights upon others. The contrary has

never been held by this court. What we now say is entirely consistent with *Gratiot* v. *United States,* 4 How. 80, and *Ex parte Reed,* 100 U. S. 13, upon which the Government relies. Referring in the first case to certain army regulations, and in the other to certain navy regulations, which had been approved by Congress, the court observed that they had the force of law. See also *Smith* v. *Whitney,* 116 U. S. 181. In neither case however, was it held that such regulations, when in conflict with the acts of Congress, could be upheld. If the services of Symonds were, in the meaning of the statute, performed 'at sea,' his right to the compensation established by law for sea service is as absolute as the right of any other officer to his salary as established by law." To the same effect was *United States* v. *Barnette,* 165 U. S. 174, 179.

In *People ex rel. Satterlee* v. *Board of Police,* 75 N. Y. 38, 42, the question was whether the compensation of a police surgeon was that fixed by statute or that named in a resolution of a board of police under which he was appointed. He accepted the appointment and performed the duties of the office for more than two years, drawing only the salary fixed by the resolution and which was less than that fixed by statute. The Court of Appeals of New York, speaking by Judge Miller—all the members of the court who voted in the case concurring—said : " As the statute gave the salary, I think fixing the amount at a less rate, by resolution, could not make it less than the statute declared. There is no principle upon which an individual, appointed or elected to an official position, can be compelled to take less than the salary fixed by law. The acceptance and discharge of the duties of the office, after appointment, is not a waiver of the statutory provision fixing the salary therefor, and does not constitute a binding contract to perform the duties of the office for the sum named. The law does not recognize the principle that a board of officers can reduce the amount fixed by law for a salaried officer, and procure officials to act, at a less sum than the statute provides, or that such official can make a binding contract to that effect. The doctrine of waiver has no application to any such case, and cannot be invoked to aid the respondent."

The ruling in that case was reaffirmed in *Kehn* v. *State*, 93 N. Y. 291, 294, which involved the claim of a fireman whose compensation had been reduced by his superior officer below that fixed by law. The court, speaking by Judge Rapallo, reaffirmed the principles of the *Satterlee* case, and approved the decision in *Goldsborough* v. *United States*, Taney's Decisions, 80, 88, saying: "The present case, however, is stronger than either of those cases cited. At the time the appellant entered into the service his pay was fixed by law, and there is no evidence that he ever consented to a change. It was reduced by the superintendent, and for a portion of the time the appellant took the reduced pay, but that does not estop him from claiming his full pay if he was legally entitled to it."

In the *Goldsborough* case referred to, Chief Justice Taney said: "Where an act of Congress declares that an officer of the Government or public agent, shall receive a certain compensation for his services, which is specified in the law, undoubtedly that compensation can neither be enlarged or diminished, by any regulation or order of the President, or of a Department, unless the power to do so is given by act of Congress."

In *Adams* v. *United States*, 20 C. Cl. 115, which involved the compensation due to one who had performed the duties of an inspector and also of deputy collector of customs, the court said: "The law creates the office, prescribes its duties, and fixes the compensation. The selection of the officer is left to the collector and Secretary. The appointing power has no control, beyond the limits of the statute, over the compensation, either to increase or diminish it." In the same case it was also said: "Monthly vouchers were drawn up, reciting the number of days the claimant was employed during the month and the amount of compensation allowed by the collector and Secretary, ending with a receipt 'in full for compensation for the period above stated,' which the claimant signed. We do not think he thereby relinquished his right to claim the further compensation allowed by law. If the appointing officer has no power to change the compensation of an inspector, certainly the paying officer has not. He had no right to exact such a receipt and the claim-

ant lost nothing by signing it. *Fisher's Case*, 15 C. Cl. 323; *Bostwick* v. *United States*, 94 U. S. 53."

We are of opinion that as the act of 1882 created a distinct, separate office—special inspector of foreign steam vessels—with a fixed annual salary for the incumbent, to be paid by the Secretary of the Treasury out of any moneys in the Treasury not otherwise appropriated; as the plaintiff was legally appointed by the Secretary a special inspector under and by virtue alone of that act; and as he entered upon the discharge of the duties appertaining to that position, he was entitled to demand the salary attached by Congress to the office in question.

It is said that the Secretary, before appointing the plaintiff, had reached the conclusion that the office of special inspector of foreign steam vessels was unnecessary and that all laws providing a separate establishment for the inspection of foreign steam vessels should be repealed. Such undoubtedly was the opinion expressed by the Secretary in his report to the Speaker of the House of Representatives at the first session, 1889, of the Forty-first Congress. But Congress did not immediately heed his recommendation on that subject, and there was no repeal of the act of 1882 until the passage of the statute of March 1, 1895, 28 Stat. 699, c. 146, § 1. During the entire term of his service as special inspector the act of 1882 was in force. If the Secretary, having become convinced that the special inspectors of foreign steam vessels were not needed and the public interests did not require the appointment of such officers, could properly, for such reasons, have withheld any action under the statute of 1882 until he again communicated his views to Congress, it does not follow that he could make an appointment under that statute conditioned that the appointee should accept a less salary than Congress prescribed. Whether a local inspector should be required to inspect foreign steam vessels without additional compensation, or whether the visitation and inspection of such vessels should be done by an officer acting under an appointment for that particular purpose, was a matter for the determination of Congress. The purpose of Congress, as indicated by the act of 1882, was to compensate the services of a special inspector of foreign steam vessels by an annual salary

.of a specified amount. .It was not competent for the Secretary of the Treasury, having the power of appointment, to defeat that purpose by what was, in effect, a bargain or agreement between him and his appointee that the latter should not demand the compensation fixed by statute. Judge Lacombe, speaking for the Circuit Court of the United States for the Southern District of New York in *Miller* v. *United States,* 103 Fed. Rep. 413, 415, well said : " Any bargain whereby, in advance of his appointment to an office with a salary fixed by legislative authority, the appointee attempts to agree with the individual making the appointment that he will waive all salary or accept something less than the statutory sum, is contrary to public policy, and should not be tolerated by the courts. It is to be assumed that Congress fixes the salary with due regard to the work to be performed, and the grade of man that such salary may secure. It would lead to the grossest abuses if a candidate and the executive officer who selects him may combine together so as entirely to exclude from consideration the whole class of men ,who are willing to take the office on the salary Congress has fixed but will not come for less. And, if public policy prohibit such a bargain in advance, it would seem that a court should be astute not to give effect to such illegal contract by indirection, as by spelling out a waiver or estoppel." If it were held otherwise, the result would be that the Heads of Executive Departments could provide, in respect of all offices with fixed salaries attached and which they could fill by appointments, that the incumbents should not have the compensation established by Congress, but should perform the service connected with their respective positions for such compensation as the Head of a Department, under all the circumstances, deemed to be fair and adequate. In this way the subject of salaries for public officers would be under the control of the Executive Department of the Government. Public policy forbids the recognition of any such power as belonging to the Head of an Executive Department. The distribution of officers upon such a basis suggests evils in the administration of public affairs which it cannot be supposed Congress intended to produce by its legislation. Congress may control the whole subject of sal-

aries for public officers; and when it declared that for the purpose of carrying into effect the provisions of the act of 1882 the Secretary of the Treasury "*shall* appoint officers to be designated as special inspectors of foreign steam vessels, *at a salary of two thousand dollars per annum each*," it was not for the Secretary to make the required appointments under a stipulation with the appointee that he would take any less salary than that prescribed by Congress. The stipulation that Glavey, who was local inspector, should exercise the functions of his office of special inspector of foreign steam vessels " without additional compensation" was invalid under the statute prescribing the salary he should receive, was against public policy, and imposed no legal obligation upon him. And the mere failure of the appointee to demand his salary as such officer until after he had ceased to be local inspector, was not in law a waiver of his right to the compensation fixed by the statute.

*The judgment of the Court of Claims is reversed, and the cause is remanded for further proceedings consistent with this opinion.*

The Chief Justice, Mr. Justice Brown, Mr. Justice Peckham and Mr. Justice McKenna dissented.