## In re INTERNATIONAL MATCH CORP.

## EHRHORN v. INTERNATIONAL MATCH REALIZATION CO., LIMITED.

### Nos. 185, 186, Dockets 21923, 21924.

United States Court of Appeals
Second Circuit.

Argued March 5, 1951.

Decided June 25, 1951.

Frank, Circuit Judge, dissented in part.

460

Oscar W. Ehrhorn, New York City, in proprio persona.

Cadwalader, Wickersham & Taft, Charles W. McConaughy and William D. Ford, New York City, of counsel, for petitioner-appellee.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On April 19, 1932, the International Match Corporation, a Delaware company, (Match) was adjudicated a bankrupt and the proceedings were generally referred to the respondent, then a referee in bankruptcy in the Southern District of New York. He continued in charge thereof until June 24, 1947, when the estate was closed after payments of dividends to creditors totalling $33,919,024.75, respondent withdrawing as commissions 1% of this sum, or $339,190.25. The order appealed from directed him to return to the reopened estate $236,729.38 plus interest, the amount by which his commissions from the Match estate when added to commissions received in the years 1932 through 1947 inclusive from other estates referred to him exceeded an average of $20,000 for the years in question.

The order below was based upon repeated violations, which were held by the court below to have been fraudulently concealed, of a standing rule of the judges of the District Court for the Southern District of New York made by Judge Knox in May 1933, that the referees should so govern themselves that the earnings of each should not aggregate more than $20,000 in any calendar year in order that the then existing national depression should not create an opportunity for the court's own officers to enrich themselves.

The respondent challenges the existence and validity of such a standing rule.

█ The respondent also asserts that the District Court lacked jurisdiction in this proceeding to proceed summarily or to give judgment running to Match. We do not agree. In December, 1948, International Match Realization Company, Limited, a Bermuda corporation, (Realization) to which had been assigned approximately 90% in amount of the claims proved against the Match estate obtained an order to show cause why that estate should not be reopened and respondent directed to repay to it so much of his commissions as might be determined to have been in excess of the $20,000 yearly maximum. The matter was referred to a special master who, proceeding summarily, held hearings at which the respondent appeared and presented his case, though denying the master's jurisdiction. The master's report recom-

mending the reopening of the Match estate and a judgment against the respondent and in favor of Match in the sum set forth above was confirmed by Goddard, J.

The respondent's objections to the nature of those proceedings so far as they have any substance can be summarized as follows:

The Bankruptcy Act, 11 U.S.C.A. § 1 et seq. provides that, upon cause being shown, an estate may be reopened, a trustee thereafter elected and a plenary action then instituted by the trustee to recover assets of the bankrupt estate. This procedure the respondent contrasts with that adopted in the instant case, which he characterizes as a summary proceeding by one creditor, dissolved during the action, which was to obtain judgment against him prior to the reopening of the estate—a judgment running to Match, the now long defunct bankrupt.

The respondent, however, misconceives the nature of the proceeding below. Accepting *arguendo* the respondent's description of the usual procedure for recovery of newly discovered assets of a bankrupt estate, that procedure is not exclusive where a court officer is charged, as respondent was here, with obtaining funds from a court by fraud or in violation of its orders. Any person, whether creditor of the estate involved or not, had the right, if not the duty, to call to the court's attention the facts and the court thereafter proceeded summarily and *sua sponte* to investigate and decide the matter and order the recovery of the sums involved as was its duty. In re De Ran, 6 Cir., 260 F. 732; see Hazel-Atlas Glass Co. v. Hartford Empire Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250; Griffen v. Thompson, 2 How., U.S., 244, 256, 11 L.Ed. 253; Slocum v. Edwards, 2 Cir., 168 F.2d 627, 631; Governor Clinton Co. v. Knott, 2 Cir., 120 F.2d 149, 152, appeal dismissed, 314 U.S. 701, 62 S.Ct. 50, 86 L.Ed. 561; In re Stillwell, 6 Cir., 12 F.2d 205, 207; Varney v. Harlow, 4 Cir., 210 F. 824, 828. The court is not required merely to reopen the case and then to leave further proceedings to be brought by a new trustee. The wrong has been done primarily to the court. The creditors who would be represented by a trustee are only incidental beneficiaries if the sums recovered should ultimately be applied for their benefit. Evidence of fraud or violation of the court's orders being shown, the court could properly try the whole case on the merits in a summary proceeding particularly where as here the facts are not substantially in dispute. Nor was the respondent prejudiced by his alleged withdrawal from the case. Though he insisted throughout that the master had no jurisdiction to hear the case on the merits, he appeared and fully argued his position. See Gerber v. Fruchter, 2 Cir., 147 F.2d 120, 122; Slocum v. Edwards, 2 Cir., 168 F.2d 627, 628, 629, 632.

The court's action in not reopening the bankrupt estate until the order was made directing the respondent to repay Match was proper for the bankrupt estate need not be reopened until the court had not only decided that the respondent had improperly obtained moneys from the court for which he should account, but also that the creditors of the bankrupt were properly entitled to such moneys.

Nor is there merit in the contention that as Match had been long since dissolved by action of the State of Delaware, the order directing payment to the Clerk of the Court to hold the fund for Match's benefit was a nullity. The order also directed that a new trustee should be elected and should proceed to enforce the judgment. Regardless of the dissolution of Match, the Match estate was still within the jurisdiction of the court below. As a trust will not fail for want of a trustee the Clerk as the order provides may act as trustee of the fund should the respondent pay the judgment prior to the election of the new trustee.

The respondent also argues that he should not be ordered to pay over the fund in question until it is determined that it is now in his possession. We need not now decide if such a rule applies to "turn over" orders addressed to a bankrupt for it has no application to an order directed to an officer of the court who has violated

its orders, whether or not the matter arises out of a bankruptcy. The respondent's asserted inability to pay is a matter which may be considered in enforcement proceedings.

Passing to the merits, it is necessary first to describe the history of the dividends and commissions in question (set forth in tabular form in the margin).[1]

Prior to September 22, 1938, the effective date of the amendment of the Bankruptcy Act discussed below, four dividends totalling $26,848,898.13 were paid to creditors from the Match estate. The respondent did not seek full payment of his statutory commissions totalling $268,488.97 (1% of $26,848,898.13) on payment of these dividends. Indeed, upon his own motion, two orders were issued, one by Judge Bondy in January 1937 covering dividends 1 and 2, and one by Judge Mandelbaum in November 1937 covering dividends 3 and 4, directing the trustee in bankruptcy to "earmark and set apart in escrow the statutory commissions of the Referee in Bankruptcy heretofore earned subject to the order of the court or referee." As the second order also directed the immediate payment of $8500 to respondent the escrow fund originally totalled $259,988.97.

Further dividends paid in 1939 and 1940 totalled $4,897,592.34. The respondent withdrew $48,975.92 as commissions on these dividends on no other authority than his own signature. The final dividend of $2,142,598.05 was declared in 1947 as

1.  Composite Tabulation Showing Dividends Paid, Orders Directing Payment, or Placement in Escrow, of Sums Relating to Referee's Commissions.

| (1) Dividends Paid by Trustees (%) | (2) Amount | (3) Totals | (4) Date of Order | Orders Pertaining to Sums Stated Col. 3 Sum Ordered Paid | Sum Ordered Escrowed |
|---|---|---|---|---|---|
| 1 Dec. 20, 1935 (5) | $4,907,698.65 | | | | |
| 2 Oct. 20, 1936 (10) | 9,795,179.00 | 14,702,877.65 | Jan. 27, 1937 [1] | None | 147,028.77 |
| 3 July 16, 1937 (5) | 4,897,586.12 | | | | |
| 4 Aug. 19, 1937 (7.4) | 7,248,434.36 | 12,146,020.48 | Nov. 19, 1937 [2] | 8,500.00 | 112,960.20* |
| 5 Aug. 22, 1939 (3) | 2,938,554.64 | | | | |
| 6 Aug. 7, 1940 (2) | 1,959,037.70 | 4,897,592.34 | | | |
| 7 Jan. 25, 1947 (2.1874) | 2,143,980.25 | 2,143,980.25 | Dec. 13, 1946 [3] | 21,439.80 | None |
| | | 33,890,470.72 | | 29,939.80 | 259,988.97* |
| | | | | | 29,939.80 |

Total ordered paid or escrowed $289,928.77

Operative provisions of Court Orders pertaining to Referee's Commissions:

1. *Jan. 27, 1937 (Judge Bondy)*: Ordered, Adjudged and Decreed that Irving Trust Company, Trustee in Bankruptcy herein, earmark and set apart in escrow the statutory commissions of the Referee in Bankruptcy heretofore earned subject to the order of the Court or Referee.

2. *Nov. 19, 1937 (Judge Mandelbaum)*: * * * Ordered, Adjudged and Decreed that Irving Trust Company, Trustee in Bankruptcy, earmark and set apart in escrow the statutory commissions of the Referee in Bankruptcy on the dividends heretofore declared June 4th, 1937 and July 30th, 1937 and respectively paid July 6th, 1937 and August 19th, 1937 and heretofore earned, subject to the order of the Court or Referee; and that the Trustee in Bankruptcy be authorized and directed to pay out of the said commissions thus set apart to the Referee within ten days hereof, the sum of $1000.00 on account thereof and the further sum of $7500.00 on or about the 3rd day of January 1938.

3. *Dec. 13, 1946 (Judge Rifkind)*: Ordered that the Irving Trust Company, as Trustee in Bankruptcy of International Match Corporation make the following payments: * * * Referee in Bankruptcy 1% on final dividend to creditors when declared.

* Excluding $8,500 ordered paid out of escrow and shown in column to left.

to which the respondent by concealing the above facts had obtained an order from Judge Rifkind in December 1946 directing the payment to him of a commission of 1% ($21,425.98). This sum plus the $8500 ordered paid by Judge Mandelbaum were the only payments specifically ordered to be made to the respondent from the Match estate, but actual withdrawals by the respondent from the estate in the years 1937–1946 inclusive totalled $114,650, and in 1947 when he knew he was not to be reappointed a referee withdrawals totalled $224,540.25. By these 1947 withdrawals he completely exhausted the escrow fund although only the above $21,425.98 was specifically ordered paid in that year.

The court below set aside the 1947 order of Judge Rifkind as obtained by fraud, directed the repayment of commissions on the 1939 and 1940 dividends as completely unauthorized, and concluded that withdrawals from the escrows were also unauthorized absent some formal order of the court or referee. The court found that these unlawful withdrawals totalled $330,690.25 out of total withdrawals of $339,190.25. However, the respondent was given an equitable credit of $93,960.87, which represented during the period of his administration of the Match estate the cumulative difference between his income after eliminating the illegal withdrawals and the $20,000 annual limit. Judgment was therefore for $236,729.38, plus interest.

Prior to September 22, 1938, the Bankruptcy Act, 32 Stat. 799 so far as it applied to fees of referees read as follows: "* * * Referees shall receive as full compensation for their services, payable after they are rendered * * * from estates which have been administered before them one per centum commissions on all moneys disbursed to creditors by the trustee * * *." 11 U.S.C.A. § 68.

The Chandler Act, 52 Stat. 859, 940, effective September 22, 1938, amended the above by adding: "The judge may, however, by standing rule or otherwise, fix a lower rate of compensation, so that no referee shall receive excessive compensation during his term of office, * * *." 11 U.S.C.A. § 68.

We may quickly dispose of so much of this appeal as relates to the $48,975.92 withdrawn as commissions on dividends 5 and 6 paid in 1939 and 1940. No opportunity was given any judge to pass on these withdrawals in any way. This is required by the Chandler Act, supra, in order that the judge before whom the estate is being administered might exercise the discretion therein provided. No authority for such a withdrawal being shown, the order directing its return was proper.

The respondent argues that as to his commissions on pre-1938 dividends, it was beyond the power of the court by standing rule, agreement or otherwise to reduce them below the statutory amount, United States v. Andrews, 240 U.S. 90 36 S.Ct. 349, 60 L.Ed. 541; Glavey v. United States, 182 U.S. 595, 21 S.Ct. 891, 45 L.Ed. 1247; see Ehrhorn v. Quillinan, 2 Cir., 170 F.2d 890, 891, and, therefore, the rule cannot now be enforced by ordering the repayment of sums which though excess of that permitted by the rule, were not in excess of the statutory 1%.

We agree that such a rule presents grave difficulties, not only in view of the cases cited above but also in its practical administration. For instance, which estates are to get the benefit of any reduction of fees resulting from the rule, and in what proportion. Such administrative difficulties may well have led to the passage of the Referees' Salary Act, 60 Stat. 326, 11 U.S.C.A. § 68, which again provided fixed compensation for referees.

However, the validity of the rule prior to 1938 is not now before us. For the purposes of this case we can accept respondent's position that the so-called rule was originally but a statement by Judge Knox to the assembled referees in 1933 that no referee who accepted over $20,000 in any one year would receive Judge Knox's vote when such a referee came up for reelection at the end of his two year term. Whatever its effect prior to the 1938 amendment, we hold that there was a valid and binding rule thereafter in the Southern District of New York that referees' commissions should not exceed $20,000 an-

nually. The record is clear that the respondent was present when Judge Knox's statement was made and offered no objection. It is also clear that the respondent accepted the statement as binding by reporting his commissions for the years 1932–1946 inclusive to the court under Local Bankruptcy Rule XXI(D) and General Order 26, 11 U.S.C.A. following section 53, in such a way as to indicate that he was receiving approximately the $20,000 limit, when in reality the cumulative excess of the respondent's commissions received from all estates in those years was approximately $66,000 in excess of $20,000 per year.

■ The crucial inquiry is rather as to the meaning and effect of the escrow orders of 1937. The court below held, and we fully agree that the escrow orders meant that the respondent could withdraw from the escrow sufficient sums in any year to bring his total compensation to the $20,000 limit stated by Judge Knox and accepted by the respondent. The latter's acts with respect to withdrawals made prior to 1947 and his income tax treatment of the escrow fully substantiate this interpretation.

The court below held that withdrawals from the escrow must be made by a formal order. As to this we do not agree. If, as we hold, the escrow orders meant that withdrawals up to $20,000 could be annually made by the referee, and that the disposition of the balance was subject to court order, the time for creditors or others to object to such a plan was when the escrow orders were made, and not when the annual withdrawals were made by the referee. Thus the latter's withdrawals on his own signature were proper in so far as they did not cause his annual income to exceed $20,000.

■ Even if the orders could have been set aside on the basis of the dictum in Ehrhorn v. Quillinan, supra, if the respondent had appealed from them when they were entered, they cannot, as the respondent himself indeed argues, be set aside in this action having become non-appealable by lapse of time, 52 Stat. 854, 855, 11 U.S.C.A. §§ 47, 48, and the court having had undoubted jurisdiction to enter them even though they might have been erroneous when entered.[2]

It thus follows that the respondent violated the escrow orders by withdrawing the entire escrow fund and was properly directed to repay with interest the amount by which his total commissions from all estates in the years 1933–1947 inclusive exceeded $20,000 per year.

However, this does not dispose of the question, for the order appealed from not only directed the return to the court of excess withdrawals from the escrow but ordered this excess to be held for the benefit of Match's creditors. As we have seen, the escrow orders contemplated a subsequent court order disposing of so much of the fund as did not properly go to the referee. This order has now been made and is challenged by respondent as violative of the pre-1938 Bankruptcy Act, 32 Stat. 799, in that the court had no authority to order the fund paid to anyone but respondent. If such is the law, it would be futile to direct respondent to repay his excess withdrawals for the court would then be forced to order them repaid to him and recovery would be limited to interest on the sums withdrawn from the date of withdrawal to the time payment should have been ordered. There are three answers to this argument.

First, the escrow orders clearly contemplated that the balance now in question would not go to respondent. Otherwise, there was no reason for such orders and the fund would simply have been turned over to him when the dividend was paid. Such being the case, respondent lost his right to object to the order under review by his failure to attack the original escrow orders which as we have stated, supra, have become non-appealable from lapse of time.

2. But cf. United States v. Ward, 8 Cir., 257 F. 372, 375, 376 (court lacks jurisdiction to enter an order granting a fee in *excess* of the statutory maximum in view of 11 U.S.C.A. § 112).

Second, as the respondent in 1937 willingly left the balance in escrow subject to court order, this balance became subject to the Chandler Act after 1938.[3]

Third, under the circumstances, the pre-1938 Act did not require payment of 1% commissions on pre-1938 dividends. As stated, supra, the Act provided that: "* * * Referees shall receive as full compensation for their services, *payable after they are rendered* * * * from estates which have been administered before them one per centum commissions on all moneys disbursed to creditors * * *." (Emphasis ours.) Referees' commissions are not earned by the mere act of paying dividends, 6 Remington, Bankruptcy (4th Ed.) 275. An estate may contain a substantial amount of cash which could without effort be immediately distributed as a dividend, leaving to the future the greatest part of the labor of administration which might result in minimal dividends. This was recognized by the pre-1938 Act, 30 Stat. 556, for it provided for equitable allocation of commissions in case of a change in referees or revocation of a reference. See Kinkead v. J. Bacon & Sons, 6 Cir., 230 F. 362, 369, certiorari denied 241 U.S. 680, 36 S.Ct. 728, 60 L.Ed. 1234; 2 Collier, Bankruptcy, (14th Ed.) 1561. Thus the payment of interim dividends did not measure the rendering of services. If the amount of dividends declared did measure the services rendered, then, if respondent had died in 1938 and a successor or referee had been appointed who administered the estate until it was closed in 1947, the successor, for nine years work, would have been entitled to approximately one-fourth as much in commissions as the respondent would have been for six years work (1932–1938). The fact that 30 Stat. 556 requires the allocation of commissions in such a situation clearly indicates that commissions are not earned by the mere payment of dividends and that respondent even under the pre-1938 Act had no vested right to 1% of dividends paid to creditors until the estate was closed. It would have been quite within the power of the court to refuse all commissions until this occurred. Had the estate been closed prior to 1938, the court should then have directed the payment to the respondent of a 1% commission[4] but as this estate was not closed until 1947, when the amount of the total commission had come within the discretion of the judge, he could properly limit respondent's commissions to a total of $20,-000 a year and direct that the balance go to creditors of the bankrupt.

It is unnecessary to determine whether the court below had power under F.R.C.P. 60(b) to set aside for fraud the 1946 order of Judge Rifkind respecting commissions on the final dividend,[5] as any payment under that order abated *pro tanto* any amount to which the plaintiff was entitled from the escrow the principal of the amount required to be repaid by the respondent is not affected.

Order affirmed.

FRANK, Circuit Judge (dissenting in part).

Before September 22, 1938, § 40, sub. a of the Bankruptcy Act provided that "Referees shall receive as full compensation for their services, payable after they are rendered * * * from estates which have been administered before them, 1 per centum commissions on all moneys disbursed to creditors by the trustees * * *." By the Chandler Act, Congress amended this section, effective September 22, 1938, by adding: "The judge may, however,

---

3. The Chandler Act "* * * shall govern proceedings so far as practicable in cases pending when it takes effect * * *." 52 Stat. 940, 11 U.S.C.A. § 1 note. See Dickinson Industrial Site, Inc., v. Cowan, 309 U.S. 382, 383, 60 S.Ct. 595, 84 L.Ed. 819.

4. But a referee is not entitled to compensation where he has rendered "negligible service." In re Stillwell, 6 Cir., 12 F.2d 205.

5. F.R.C.P. 60(b), 28 U.S.C.A., applies to bankruptcy proceedings, General Order 37, 11 U.S.C.A. following section 53; Labarbera v. Grubard, 2 Cir., 112 F.2d 738. But see Grand Union Equipment Co. v. Lippner, 2 Cir., 167 F.2d 958, 961.

by standing rule or otherwise, fix a lower rate of compensation, so that no referee shall receive excessive compensation during his term of office * * *."

Accordingly, I agree with so much of the decision as relates to commissions on dividends paid after September 22, 1938.[1] But I dissent as to the repayment of earned statutory commissions on dividends paid before that date.

I am not prepared to hold that American judges are "above the law," are members of a specially privileged caste, or elite, inherently exempt from obligations imposed by statutes and the Constitution on all other persons, including the highest non-judicial officers. Yet unless we do so hold, it is, I think, impossible to conclude that, before the amendment of § 40, sub. a, the so-called "standing rule" of the court below was not illegal and void, if it was intended to limit the statutory compensation of referees in bankruptcy. For consider this: Suppose that a statute, creating an office, provided that the compensation was to be 1% of certain funds collected by the office-holder; that the term of office should be two years; and that the appointment to the office should be by the President of the United States. Suppose the President told the person he appointed that he would not be reappointed if he took more than $20,000 a year as compensation even if the 1% exceeded that sum. Suppose the appointee took the 1%; that that was far greater than $20,000 a year; that he concealed that fact from the President; and that the President reappointed him. If suit were brought by the government to recover the excess, any federal judge would unquestionably dismiss the suit. He would hold either (1) that the President's statement about reappointment was an effort to make an

unlawful bargain founded upon an illegal consideration or (2) that the President could not lawfully use as a criterion of reappointment the appointee's willingness to reduce his full statutory compensation.

This is not novel doctrine. Over many decades the United States Supreme Court, and most state courts, have denounced as illegal every conceivable method that can be contrived to reduce an official's statutory compensation. The rulings may be summarized as follows: Where a statute fixes the pay for a public office, the holder is absolutely entitled to that pay. If he contracts to take less, the contract is illegal and void. Once his services have been performed, he will not be held by such an agreement, whether made before or after that performance. Nor will he be estopped by a release or receipt in full, or by any other sort of conduct or "waiver," from claiming the full compensation for which the statute provides. Two principal reasons are advanced for this doctrine:

(1) When the legislature creates the post and prescribes its duties, powers, emoluments, and the conditions on which the post is to be held, officers of other branches of the government are acting—legislating—unconstitutionally, if they undertake, by agreement, or rule or otherwise, to alter the terms which the legislature has fixed. Similarly, a statute is unconstitutional which seeks to take away an officer's right to compensation already earned under an earlier statute.[2]

(2) In Glavey v. United States, 182 U.S. 595, 608–610, 21 S.Ct. 891, 896, 45 L.Ed. 1247, the Court said: "The purpose of Congress, as indicated by the act of 1882, was to compensate the services of a special inspector of foreign steam vessels by

---

1. For, as my colleagues say, no judge had the opportunity to pass on respondent's withdrawals of those commissions. .

2. Steamship Co. v. Joliffe, 2 Wall. 450, 457–458, 17 L.Ed. 805; Fisk v. Police Jury of Jefferson Left Bank, 116 U.S. 131, 6 S.Ct. 329, 29 L.Ed. 587; State of Mississippi for Use of Robertson v. Mil-

ler, 276 U.S. 174, 179, 48 S.Ct. 266, 72 L.Ed. 517; Campbell v. City of Boston, 290 Mass. 427, 195 N.E. 802; State ex rel. Pike v. City of Bellingham, 183 Wash. 439, 48 P.2d 602; Salley v. McCoy, 182 S.C. 249, 189 S.E. 196; cf. Lynch v. U. S., 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434. See also other cases cited in note 7 infra.

an annual salary of a specified amount. It was not competent for the Secretary of the Treasury, having the power of appointment, to defeat that purpose by what was, in effect, a bargain or agreement between him and his appointee that the latter should not demand the compensation fixed by statute. Judge Lacombe, speaking for the circuit court of the United States for the southern district of New York in Miller v. United States [c.c.] 103 F. 413, 415, well said: 'Any bargain whereby, in advance of his appointment to an office with a salary fixed by legislative authority, the appointee attempts to agree with the individual making the appointment that he will waive all salary or accept something less than the statutory sum, is contrary to public policy, and should not be tolerated by the courts. It is to be assumed that Congress fixes the salary with due regard to the work to be performed, and the grade of man that such salary may secure. It would lead to the grossest abuses if a candidate and the executive officer who selects him may combine together so as entirely to exclude from consideration the whole class of men who are willing to take the office on the salary Congress has fixed, but will not come for less. And, if public policy prohibit such a bargain in advance, it would seem that a court should be astute not to give effect to such illegal contract by indirection, as by spelling out a waiver or estoppel.' "[3] See also U. S. v. Andrews, 240 U.S. 90, 94–96, 36 S.Ct. 349, 60 L.Ed. 541; MacMath v. United States, 248 U.S. 151, 152, 39 S.Ct. 31, 63 L.Ed. 177.

Doubtless, the flat 1% provision of § 40, sub. a, previous to its amendment, gave referees, during the Great Depression, undesirably high compensation, so that a reduction or limitation was eminently desirable. But the reduction of, or authorization to limit, this figure was a legislative, not a judicial, function. The judges had no more authority to limit the referees' statutory fees than to limit the statutory salaries of

---

**3.** The Court also quoted with approval from Adams v. United States, 20 Ct.Cl. 115, as follows: "Monthly vouchers were drawn up, reciting the number of days the claimant was employed during the month and the amount of compensation allowed by the collector and Secretary, ending with a receipt 'in full for compensation for the period above stated,' which the claimant signed. We do not think he thereby relinquished his right to claim the further compensation allowed by law. If the appointing officer has no power to change the compensation of an inspector, certainly the paying officer has not. He had no right to exact such a receipt and the claimant lost nothing by signing it." [182 U.S. 595, 21 S.Ct. 895.]

That there can be no "waiver" or "estoppel" in such a case, see, e. g., People ex rel. Satterlee v. Board of Police, 75 N.Y. 38, 42; Bishop v. City of Omaha, 130 Neb. 162, 264 N.W. 447; Wolf v. Humboldt County, 36 Nev. 26, 131 P. 964, 45 L.R.A.,N.S., 762; Salley v. McCoy, 182 S.C. 249, 189 S.E. 196; Bell v. Town of Mabton, 165 Wash. 396, 5 P.2d 514; State ex rel. Pike v. City of Bellingham, 183 Wash. 439, 48 P.2d 602; State ex rel. Rothrum v. Darby, 345 Mo. 1002, 137 S.W.2d 532; Reed v. Jackson County, 346 Mo. 720, 142 S. W.2d 862; Allen v. City of Lawrence, 318 Mass. 210, 61 N.E.2d 133, 160 A.

L.R. 486; Hamilton v. Edmundson, 235 Ala. 97, 177 So. 743; Pitsch v. Continental & Commercial Nat'l Bank, 305 Ill. 265, 137 N.E. 198, 201–202, 25 A.L. R. 164; Peterson v. City of Parsons, 139 Kan. 701, 33 P.2d 715; Mack v. City of Mayfield, 239 Ky. 420, 39 S.W.2d 679; City of Louisville v. Thomas, 257 Ky. 540, 78 S.W.2d 767; County Commissioners of Anne Arundel County v. Goodman, 172 Md. 559, 192 A. 325, 326.

And that this is true when such an agreement has been ratified by a judge, see, e. g., Reed v. Jackson County, 346 Mo. 720, 142 S.W.2d 862.

An estoppel to assert illegality is ineffective. Coppell v. Hall, 7 Wall. 542, 558, 19 L.Ed. 244; McMullen v. Hoffman, 174 U.S. 639, 658, 19 S.Ct. 839, 43 L.Ed. 1117; Pope Mfg. Co. v. Gormully, 144 U.S. 224, 234–236, 12 S.Ct. 632, 36 L.Ed. 414; Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; U. S. v. Andrews, 240 U.S. 90, 95, 96, 36 S.Ct. 349, 60 L.Ed. 541; Nachman Spring-Filled Corp. v. Kay Mfg. Co., 2 Cir., 139 F.2d 781, 783, 784; E. E. Taenzer & Co. v. Chicago, R. I. & P. Ry. Co., 6 Cir., 191 F. 543, 551.

Annotations on this subject will be found in 70 A.L.R. 972; 118 A.L.R. 1458; 160 A.L.R. 490.

the members of the Congress or the Governors of the States.[4]

Because the federal courts have always roundly condemned as an illegal usurpation of power every sort of attempt made by non-judicial officers to reduce statutory fees or salaries, those courts should be especially quick to denounce as equally illegal any such attempt made by federal judges. Particularly in a proceeding like this, brought (as my colleagues say) to undo an alleged "wrong done to the court" by an official, should the court itself not endorse or give any effect to illegal conduct which the judges may have tried to practice on that official.

Indeed, I would interpret Judge Knox's statement in 1933 as originally intended to apply solely to the non-statutory compensa-

tion of referees,[5] for to that extent the limitation was valid previous to the 1938 amendment. Thus in Ehrhorn v. Quillinan, 2 Cir., 170 F.2d 890, we had before us the question of the non-statutory compensation of this very respondent as a Special Master, in the light of the very so-called "standing rule" again before us in the instant case. We held that "rule" valid as to such compensation. But we carefully differentiated that situation from one involving his statutory compensation as a referee. As to the latter we said, 170 F.2d at page 891, that compensation is to be computed as provided in § 40 before its amendment and "is not subject to diminution or change by agreement since that would be in contravention of public policy which makes any such undertaking void."

4. The doctrine of the cited cases will dispose of the following argument: Before the 1938 amendment, the district judges, under § 22, 11 U.S.C.A. § 45, might for "cause," have revoked the reference, and transferred the administration of this estate to another referee had they known that respondent had taken, or intended to take, compensation greater than $20,000 a year; therefore, by his concealment of his conduct or intentions, he is estopped to assert his rights to his statutory compensation. To sustain that argument, it is necessary to say that, although before the amendment of § 40, sub. a the judges lacked all authority to reduce fees below the statutory figure, yet it was "cause" for revoking a reference that a referee concealed the fact that he took, or intended to take, what the statute gave him. Patently, this argument involves a forbidden evasion of the statute.

The doctrine also leads to the rejection of the following argument made by the Special Master in this case: Respondent could validly "waive" a portion of the amount due him after it was earned; his seeming acquiescence in the "escrow" orders, was, in effect, a "waiver" of any amount in excess of $20,000 per annum; the judges—in not revoking the reference and in reappointing him—relied on this "waiver"; he is therefore estopped, etc. etc.

5. My colleagues "accept respondent's position that the so-called rule was originally but a statement by Judge Knox to the assembled referees in 1933 that

no referee who accepted over $20,000 in any one year would receive Judge Knox's vote when such a referee came up for re-election at the end of his two-year term." Doubtless my colleagues do so because the judge below refused to subpoena Judge Knox as a witness for the respondent "in view of the state of the record"—i. e., since Judge Knox's testimony before the House Committee on the Judiciary at the Hearings on H. R. 6439, 75th Cong., 1st Sess. (pp. 88–90) was admitted by the special master on the consent of counsel for the petitioner instead of subpoenaing Judge Knox himself. That testimony, in part, is as follows: "I have put it up to the Referees that they cannot get so much money by my acquiescence indefinitely, and I have said, 'If you are going to be reappointed by my vote, you will have in a proper case to waive your fees.'"

Referee Kurtz, on the other hand, was called as a witness before the special master and testified that Judge Knox had told a meeting of the referees in May 1933, that the Judges of the Southern District of New York "had met and that they were fearful that some referees would make so much money that it might cause a scandal and that the Judges had determined that the referees should have a ceiling over their earnings, and that they should not aggregate more than $20,000 in any calendar year." Referee Kurtz further testified that Judge Knox had directed the referees to "govern themselves accordingly."

My colleagues say that they are not over-ruling that decision or departing from its doctrine. Nevertheless, I believe that they have nullified that doctrine here, as to the pre-1938 statutory commissions, by resorting to several arguments which I think untenable.

1. My colleagues' first argument, as I understand it, is this:

(A) Respondent was not automatically entitled to the entire "escrowed" 1% of the dividends declared previous to September 22, 1938—the day on which the statutory amendment to § 40, sub. a of the Bankruptcy Act became effective. On that day, the so-called "standing rule" (limiting compensation to $20,000 a year) first became valid in respect of the statutory compensation of referees. Had respondent died on that date, there might have remained much work to be done by a succeeding referee up to the time of the estate's closing. In that event, when the estate was closed in 1947, the district court—acting pursuant to § 40, subs. b and c—could and should have apportioned the 1% commissions on the dividends paid before September 22, 1938, allotting only a fair proportion for the services rendered by respondent up to September 22, 1938. Therefore (my colleagues say) respondent's compensation may be divided into two parts, the first being for the period up to September 22, 1938, the second being for the period from September 22, 1938, to the closing of the estate in 1947; for the first period, respondent is entitled to but a fair proportion of the 1% commissions on dividends paid in that period.

(B) My colleagues then assert that one or both of these two results ensue: (1) Because the amount of compensation due respondent for the period up to September 22, 1938, was on that day undetermined, he had then no vested interest whatever in that compensation. The time for determining that amount arrived in 1947, after the statutory amendment of September 22, 1938, had

validated the "standing rule." Consequently that "rule" governed the compensation owing for the entire period from the institution of the bankruptcy proceedings in 1932 to the closing of the estate in 1947; and that "rule" was correctly applied in the order now on appeal. (2) At any rate (say my colleagues), respondent's earnings allocable to the period previous to September 22, 1938, could be determined validly, at any time after the estate's closing in 1947—without any regard to the actual fair allocation of the commissions—at an amount which would yield respondent no more than $20,000 a year for those services plus those rendered to other estates in the period ending September 22, 1938.

With (A) of this argument I agree (although with some hesitation, since respondent in fact continued to function as referee until the estate was closed, and it is somewhat artificial to divide into segments his continuous services, as if he had been two different referees). But for the following reasons, I do not agree with either of the asserted corollary conclusions in (B):

(1) The mere fact that the precise proportion of the "escrowed" commissions which respondent had earned up to September 22, 1938, was not then determined, or determinable, did not prevent him from then having a vested right in that proportion of those commissions, at whatever amount it later would properly be determined, *i. e.*, that right was vested on September 22, 1938, although the exact amount could not then be known. Thus his death on that day could not have cut off the right of his estate to his fair share of the "escrowed" commissions, merely because on that day that share was not ascertained.[6] His right, arising in effect out of a contract, had so completely vested, regardless of whether it was then fixed as to amount, that if a new statute had expressly sought to destroy it, the statute would have been unconstitutional.[7] Accordingly, such a new statute

6. 6 Corbin, Contracts (1951) pp. 300–301; 6 Williston, Contracts (Rev. ed., 1938) 5542; Restatement of Contracts, § 468; Restatement of Restitution, § 149 (see also pp. 23, 524).

7. Ettor v. City of Tacoma, 228 U.S. 148, 149, 156, 33 S.Ct. 428, 57 L.Ed. 773; State of Miss. for Use of Robertson v. Miller, 276 U.S. 174, 179, 48 S.Ct. 266, 72 L.Ed. 517; Coombes v. Getz,

would, if possible. be interpreted to operate prospectively, not retroactively.[8] Since a statute could not constitutionally destroy that right, obviously a court rule or order could not; any such court rule or order, if intended to operate retroactively, was therefore illegal, unconstitutional.

(2) Nor, when the estate was closed in 1947, could a judge arbitrarily have decided that, for respondent's services before September 22, 1938, he should receive compensation (together with his fees from other estates) at the rate of but $20,000 a year, irrespective of the actual share of the statutory commissions fairly allocable to that period. No more could the judge who entered the order now on appeal. The amendment of § 40, sub. a was prospective, otherwise it would be unconstitutional; the "standing rule" therefore became valid, with reference to referees' commissions, only as to those earned after September 22, 1938. Accordingly, nothing in amended § 40, sub. a or in that "rule" empowered a judge to hold that the fair share previously earned was to be measured by the $20,000-a-year yardstick. For all we know, that fair share may be the entire amount of the "escrowed" commissions. What is such a share presents an issue of fact, which must be judicially and fairly, not arbitrarily, determined. It has not been so determined.

The trial judge did not even purport to make such a determination, for the idea of apportionment originated with my colleagues. Nor was any evidence offered on which such a determination can rest, so that, even if the trial judge had made a finding on this issue, his finding would have

been "clearly erroneous." Moreover, he made no such finding; and, as under General Order 37; Fed.Rules Civ.Proc., Rule 52(a), 28 U.S.C.A., applies, such a finding is necessary.[9] Consequently I think we should remand for a finding of that fact, based on evidence not present in the record but which may now be offered.

2. My colleagues, however, resort to a second argument which runs thus:

> Two district judges respectively entered the "escrow" orders in 1937. Those orders were then final and appealable, because they were plainly intended finally to deprive respondent of all right to the escrowed sums. Although those orders were erroneous, respondent cannot now attack them, since he failed to take timely appeals, so that those orders have become nonappealable by lapse of time. Therefore, we cannot now consider the validity of those orders, even if, with utter illegality, they struck down respondent's vested rights. The destruction of those rights is now *res judicata;* and *res judicata* makes black white, and wrong right.

To this argument, I have several replies:

(a) If those orders had unmistakably purported to cut off respondent's vested right, then (for reasons canvassed above) those orders on their face would have been beyond the constitutional power of the judges who entered them. I gravely doubt whether such orders would be immune from attack due to the lapse of the time for taking appeals. To protect the integrity of the

---

285 U.S. 434, 442, 52 S.Ct. 435, 76 L. Ed. 866; Lynch v. U. S., 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434; U. S. v. Northern Pac. Ry. Co., 256 U.S. 51, 64, 66–67, 41 S.Ct. 439, 65 L.Ed. 825; U. S. v. Central Pac. R. Co., 118 U.S. 235, 238, 6 S.Ct. 1038, 30 L.Ed. 173; Steamship Company v. Joliffe, 2 Wall. 450, 457–458, 17 L.Ed. 805; Forbes Boat Line v. Board of Commissioners, 258 U.S. 338, 339, 42 S.Ct. 325, 66 L. Ed. 647; Fisk v. Police Jury of Jefferson, 116 U.S. 131, 6 S.Ct. 329, 29 L.Ed. 587; Campbell v. City of Boston, 290 Mass. 427, 195 N.E. 802.

8. U. S. v. Central Pac. R. Co., 118 U.S. 235, 240–241, 6 S.Ct. 1038, 30 L.Ed.

173; Steamship Company v. Joliffe, 2 Wall. 450, 458–459, 17 L.Ed. 805; cf. Broughton v. City of Pensacola, 93 U.S. 266, 270, 23 L.Ed. 896; Town of Red Rock v. Henry, 106 U.S. 596, 604, 1 S. Ct. 434, 27 L.Ed. 251; Campbell v. City of Boston, 290 Mass. 427, 195 N.E. 802, 803.

9. See In re Pure Penn Petroleum Co., Inc., 2 Cir., 188 F.2d 851; 1 Collier, Bankruptcy (14th ed. § 2.81, 8 Collier, §§ 1.35, 1.37; Kelley v. Everglades District, 319 U.S. 415, 418, 63 S.Ct. 1141, 87 L.Ed. 1485; Rosenberg v. Heffron, 9 Cir., 131 F.2d 80–82; In re Stein, D. C., 43 F.Supp. 845, 847.

judicial system, the courts should, I think, at any time vacate orders which thus defy constitutional limitations on judicial authority. Cf. Hazel-Atlas Co. v. Hartford Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L. Ed. 1250; United States v. Ward, 8 Cir., 257 F. 372, 375–376. But I do not rest my dissent on that ground.

(b) Those "escrow orders," on their face, by no means purported finally to cut off respondent's vested right. They merely directed the trustee to "earmark and set apart in escrow the *statutory commissions* of the Referee in Bankruptcy heretofore earned *subject to the order of the court or referee."* [10] Surely this is language which can be interpreted reasonably as simply postponing payment of some or all the "statutory" commissions "heretofore earned," leaving the time of payment subject to future orders. To refuse to give these orders that sensible interpretation—to construe them as designed deliberately and illegally to deprive respondent of his vested right—is to impute to two honorable district judges the intention to act unlawfully, unconstitutionally. Certainly, such an interpretation should be avoided if possible, as is the case here. If, as we easily can, we avoid that interpretation, then we have orders in each of which the judge reserved full power to make future changes. An order containing such a reservation is revocable, tentative, and accordingly interlocutory. Republic of China and Directorate General v. American Express Co., Inc., 2 Cir., 1951, 190 F.2d 334; City of Covington v. First National Bank of Covington, 185 U.S. 270, 277, 22 S. Ct. 645, 46 L.Ed. 906; City of Paducah v. East Tenn. Tel. Co., 229 U.S. 476, 33 S.Ct. 816, 57 L.Ed. 1286; cf. United States v. Smith, 331 U.S. 469, 471, 67 S.Ct. 1330, 91 L.Ed. 1610.

Even if, under 11 U.S.C.A. §§ 47 and 48, respondent might perhaps have appealed from those orders, despite the fact that they were interlocutory, nevertheless his failure to do so could not bar him from appealing later, if and whenever those orders subsequently became final. Western States

Machine Co. v. S. S. Hepworth Co., 2 Cir., 152 F.2d 79, 80. They became final, if at all, only when they were apparently treated as final in the order now on appeal.

But my colleagues assert that we cannot avoid regarding those orders, when entered, as designed, unambiguously and finally, to wipe out respondent's vested right—*i. e.,* we must ascribe an irrevocable illegal purpose to the judges who entered those orders —because (say my colleagues) "otherwise there was no reason for such orders." Strangely, however, two paragraphs later, my colleagues themselves set forth elaborately another perfectly good reason, as follows: The estate was not closed in 1937 when the "escrow orders" were entered; more work by a referee was still to be done; the balance of that work might have to be done by some other referee who (as in the event of respondent's death) would succeed respondent; therefore in 1937 it was most desirable to defer payment of respondent's compensation until the closing of the estate (which, as it turned out, occurred ten years later). So interpreting the orders —as keeping the amount of compensation in suspense—they had no finality; wherefore respondent lost nothing by not appealing from them.

3. My colleagues advance a third argument: "As the respondent in 1937 willingly left the balance in escrow, this balance became subject to the Chandler Act after 1938." Much of what I have said above suffices, I think, to answer this argument: (1) The Chandler Act, in amending § 40a, did so prospectively. It did not authorize the judges to affect respondent's vested right to his statutory compensation already earned. Had it done so, it would have been unconstitutional.[11] (2) If respondent's acquiescence in the escrow orders is regarded as a consent to have his earned statutory commissions reduced, that consent was illegal and void.[12] (3) The "escrow" orders did not purport to cut off his vested right but merely to keep in suspense, for future determination, his fair share, already earned, of the "escrowed" commissions.

10. Emphasis added.

11. See cases cited in notes 2 and 7, supra.

12. Glavey v. U. S., 182 U.S. 595, 21 S. Ct. 891, 45 L.Ed. 1247; U. S. v. Andrews, 240 U.S. 90, 94–96, 36 S.Ct. 349,

Of course, I do not approve of respondent's furtive conduct. A scrupulous man would have obtained his rights by forthrightly demanding them. But insofar as respondent obtained no more than his rights, he should not be held to have forfeited them because he acted furtively.[13] His evasions and his tacit prevarications did not convert him into *caput lupinum,* a rightless being, an outlaw. The "unclean-hands" doctrine is here inapposite, if on no other ground than that respondent, who sought no relief below, employed his devious ways—so far as they related to the pre-statutory-amendment period—in order to block what may have seemed to him an effort to deprive him of his vested rights by means of the "standing rule" which, with respect to his statutory compensation as referee, had only an illegal foundation in its application to that period.[14] To the extent that he has but procured what lawfully was his, we should not compel him to surrender it by enforcing a "rule" which, if intended to apply to that compensation, was unlawful. To do so would be to gut the important public policy which opposes efforts to reduce statutory compensation; the result would be to upset the status quo—since respondent has already received the moneys—in order to accomplish such an interdicted reduction.[15] The status quo should not be disturbed when, as here, we have in effect "an applicant who complains of misconduct and then is shown up himself"; the "clean hands" maxim expresses a "policy against judicial aid for carrying out illegal transactions."[16]

In sum, as to the services for the period before September 22, 1938, I see only an issue of fact which remains to be settled after the hearing of further evidence, *i. e.,* the fair proportion of the commissions, on dividends theretofore paid, which should be allocated to that pre-amendment period.[17] If, but only if, the resultant figure, fairly computed, comes to less than the commissions respondent has received for that period (some $268,000), he should be ordered to repay the difference.

In all other respects, I concur in the majority opinion—with the understanding that when my colleagues say, "The respondent's asserted inability to pay is a matter which may be considered in enforcement proceedings," they mean this: The order to repay will not be taken as in any sense an adjudication that, at the time of that order's entry, he could have complied. Cf. Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476.

60 L.Ed. 541; see also the other cases cited in the early part of this dissenting opinion.

13. "Equity does not demand that its suitors shall have led blameless lives." Loughran v. Loughran, 292 U.S. 216, 229, 54 S.Ct. 684, 689, 78 L.Ed. 1219; Standard Oil v. Clark, 2 Cir., 163 F.2d 917, 927–928.

14. Cf. Johnson v. Yellow Cab Co., 321 U.S. 383, 392, 64 S.Ct. 622, 88 L.Ed. 814; Langley v. Devlin, 95 Wash. 171, 163 P. 395, 400–401, 4 A.L.R. 32; Chafee, Coming Into Equity With Unclean Hands, 47 Mich.L.Rev. (1949) 877, 1065.

15. Cf. the numerous cases refusing to upset the status quo where the parties are in *pari delicto*, especially where the party seeking relief is the greater wrongdoer, and where a major public policy would be injured if he were granted relief. See Restatement of Restitution, § 140 and Comment; 6 Corbin, Contracts (1951) § 1534.

16. Chafee, loc. cit., 889.

17. In computing that allocation, it should be considered how far the commissions properly allowable on dividends paid after September 22, 1938, represent fair compensation for the services rendered from that date to the closing of the estate in 1947. So far as they do, no part of the 1% commissions on the dividends paid before September 22, 1938, can be fairly allocated to services rendered in the later period.