**Joseph A. BRUST, as Trustee of the Estate of International Match Corporation, bankrupt, Plaintiff,**

v.

**IRVING TRUST COMPANY, Defendant.**

United States District Court, S. D. New York.

March 4, 1955.

Glass, Lynch & Kirsch, New York City, for plaintiff. Bernard Alpert, New York City, of counsel.

Rosenman, Goldmark, Colin & Kaye, New York City, for defendant. Godfrey Goldmark and Ambrose Doskow, New York City, of counsel.

PALMIERI, District Judge.

This is an action by the successor trustee in bankruptcy of the International Match Corporation (Match) against a former trustee of Match. The plaintiff seeks to recover moneys alleged to have been wrongfuly paid by the defendant as commissions to former referee in bankruptcy Oscar W. Ehrhorn before whom this bankrupt estate was administered. Match was adjudicated a voluntary bankrupt on April 19, 1932 and the case was generally referred to Ehrhorn on the same day. The defendant, Irving Trust Company, was appointed trustee on June 1, 1932, and exercised its duties over a period of about fifteen years, until 1947.

The bankruptcy was probably the largest and most complex in the history of this Court. The total assets, the claims finally allowed, and the total of the sums disbursed amounted to many millions of dollars. Ehrhorn collected as commissions the sum of $339,190.25. This amount was paid in the form of 48 checks, prepared, signed, and issued by the defendant, and countersigned by Ehrhorn, on various dates between November 20, 1937 and May 21, 1947. In In re International Match Corp., 2 Cir., 190 F.2d 458, certiorari denied, 1951, 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 655, Ehrhorn was held to have violated, by fraudulent concealment, a standing rule of the judges of this Court that the referees in bankruptcy should limit their earnings to $20,000 in any calendar year. The Court affirmed an order requiring Ehrhorn to repay $236,729.38 plus interest to a trustee who would hold the money for Match's benefit. Plaintiff was elected trustee after the decision of the Court of Appeals. He promptly discovered that the judgment against Ehrhorn was uncollectible and in February 1952 he initiated this action against the former trustee.

Plaintiff bases his asserted right to recover on two theories. First, plaintiff alleges that defendant charged itself with a reserve fund of $317,715.21 in a report that it filed on October 11, 1945 and that defendant never accounted for liquidation of that reserve. Therefore, plaintiff contends, the estate was never closed, defendant is still accountable for the reserve, and defendant should be required to pay it over to plaintiff for proper distribution. Second, plaintiff alleges that since it has been decided that Ehrhorn had no right to the commissions which were paid to him by defendant, defendant had no right to pay them, and that defendant should repay the unlawfully paid sums to the trustee now that it has been discovered that Ehrhorn cannot do so.

Both theories under which plaintiff seeks to recover depend on what occurred prior to the time when former

464

Referee Ehrhorn purported to discharge the defendant as trustee and close the case on June 23 and 24, 1947. On October 11, 1945, defendant submitted to the referee its "Final Report * * * and Petition for Allowance." This report, consisting of 171 printed pages, contained one schedule in which the defendant set forth its receipts and another in which it set forth its disbursements for the period beginning with its appointment as trustee and ending August 31, 1945. Included among the disbursements was an item called "Reserve set aside representing earned commissions of referee in bankruptcy . . . $317,715.21." The schedules concluded with a summary in which the amount of the disbursements, including the aforementioned reserve, was subtracted from the receipts and the remainder stated. From the remainder were deducted certain preferred claims and the sum of the liquidating dividends which had been paid to the general creditors before August 31, 1945, leaving a balance of approximately $2,662,000.

On November 9, 1945, Ehrhorn gave all the creditors notice of the filing of defendant's "Final Report * * * and Petition for Allowance" and of other applications for allowances. This notice informed the creditors that the applications for allowances would be considered at a "final meeting of creditors to be held before the undersigned Referee * * * on the 6th day of February, 1946" and that at this meeting "the Trustee's Account will be examined, and if found correct the same will be allowed and an order then ·or thereafter entered without further notice discharging the Trustee of its trust; a final dividend will be declared by the Referee * * *." The notice also stated that the creditors could examine the trustee's "Final Report * * * and Petition for Allowance" at the Referee's office and that according to it the balance on hand was $2,662,000.

On February 6, 1946, the creditors held a meeting before Referee Ehrhorn pursuant to the notice of November 9, 1945. None of the creditors voiced any objection to the accounts in the trustee's "Final Report * * * and Petition for Allowance" when such objections were called for by the Referee. Instead, those present at the meeting acted on the assumption that the only amount available for further allowances to the trustee, the trustee's attorneys, and others, and for distribution to the creditors after these allowances had been paid, was the amount which the defendant had given as the balance on hand in its "Final Report * * * and Petition for Allowance," namely, $2,662,-000. The creditors vigorously attacked the petitions for allowances that had been submitted by the defendant and its attorneys. They argued that if these petitions were granted the cost of administration, in which was included the reserve for referee's commissions, would constitute too large a portion of the trustee's total receipts. After argument on the petitions for allowances the referee reserved decision and adjourned the meeting.

Several months later, on July 19, 1946, the referee recommended that the account of the trustee in bankruptcy be approved and that allowances of certain amounts be made to the trustee and its attorney. The referree submitted his recommendations accompanied by the trustee's "Final Report * * * and Petition for Allowance" and other papers to a judge of this Court.

On November 30, 1946 Judge Rifkind filed an opinion in which he stated that an order would be signed approving the account of the trustee as filed. Judge Rifkind accepted all but one of the referee's recommendations. He modified the allowance recommended for the attorneys for the trustee by increasing it. And on December 13, 1946 Judge Rifkind signed an order providing that the defendant's "accounts * * * as heretofore submitted and filed, be and the same hereby are, approved and allowed" and that the de-

fendant pay the "Referee in Bankruptcy 1% on final dividend to creditors when declared."

On December 20, 1946 the adjourned final meeting of creditors was held. This meeting was attended by the president and counsel of the International Match Realization Co. (Realization) which was the owner of 90% of the creditors' claims. Defendant submitted accounts bringing its receipts and disbursements up to date. Attached to these accounts was a page headed "Calculation of Balance Available for Final Dividend" which showed the cash on hand on December 17, 1946 as approximately $2,650,000. From this amount there was deducted the allowances as per Judge Rifkind's order, the estimated expense of closing the case, and the referee's commission figured at 1% of the final dividend. As a footnote to the expenditure called "Referee's commission" there was included a calculation of the total commission set aside for the referee, as follows:

| "Total distributions to general and preferred creditors to date | $31,776,426.70 |
| Final distribution, as above | 2,143,980.25 |
| Total | $33,920,406.95 |
| Referee's commissions thereon @ 1% | $339,204.07 |
| Reserve previously set aside for earned commissions of referee | $317,715.21 |
| Additional amount provided, as above | 21,488.86 | $339,204.07." |

The calculation included a figure called "Balance available for final distribution." The meeting was adjourned to January 9, 1947 on which day it was adjourned sine die.

On January 20, 1947 the referee signed an order directing payment of the final dividend on all claims. Thereafter, defendant mailed checks to the creditors. These checks stated in prominent letters "Seventh and Final Dividend 2.1874%."

On June 23, 1947 defendant filed its three-page "Final Report and Account" in which it referred to the "Final Report * * * and Petition for Allowance" which it had filed on October 11, 1945, and to the orders of the referee and Judge Rifkind. The defendant stated that it had complied with these orders insofar as possible, and annexed to this document a bank statement showing no balance to its credit. It asked that "this Final Report and Account * * * be received, passed and approved and an order entered herein discharging the trustee of its trust." The referee ordered that the "report be confirmed and allowed and that Irving Trust Company, Trustee in bankruptcy of the above named bankrupt, be and it hereby is discharged of its trust" on June 23, 1947. And on the following day, June 24, the referee filed a certificate in the District Court closing the case.

The first theory upon which plaintiff seeks to recover stems from the fact that defendant allegedly "charged itself with a reserve fund in the sum of $317,715.21" in its "Final Report * * * and Petition for Allowance" filed on October 11, 1945, and that defendant did not give the creditors notice of its "Final Report and Account" filed on June 23, 1947 in which it showed that it had no balance to its credit. Plaintiff argues that since the estate contained an unadministered asset, the reserve fund, and since the creditors were not notified of the "Final Report and Account" or called to a final meeting after June 23, 1947, the case could not properly be closed and defendant should now account for the reserve fund.

I do not believe plaintiff's argument is tenable. It overlooks the fact that defendant did not *charge* itself with possession of a reserve fund, but *credited* itself with the disbursement of assets of the estate into a reserve fund for the referee's commissions. Just as one can adequately account for disbursement of funds by showing that they were paid to another, so one can adequately account for disbursement of funds by showing that they were placed in a reserve for the benefit of another. The ultimate

question is whether the creditors were given adequate notice that the amount placed in the "Reserve set aside representing earned commissions of referee in bankruptcy" was dedicated for payment to the referee and was not considered available for dividend payments to them.

In my opinion, the trustee gave the creditors adequate notice. In its "Final Report * * * and Petition for Allowance" the trustee included the reserve among the disbursements as it had done when it had filed its Seventh and Eighth Intermediate Report and Account. The creditors were informed that the report was a "final" report, that the meeting was a "final" meeting, and that the dividend which they were to receive after allowances were made was a "final" dividend. Since the disbursements including the reserve for referee's commissions were subtracted from the receipts, and since only the balance was considered available for allowance and the final dividend to creditors, the trustee's report made it clear that the reserve for referee's commissions would not be available for distribution to the creditors. Other documents, Realization's Exhibit No. 1 which Realization offered in evidence at the final meeting of creditors held on February 6, 1946, and the "Calculation of Balance Available for Final Dividend" which the trustee submitted to the creditors on December 20, 1946, also evidence the fact that the trustee adequately revealed to the creditors that it considered the reserve set aside for referee's commissions as a fund that belonged to the referee.

The failure of the trustee to arrange for notification of the creditors and the calling of a final meeting after June 23, 1947 when it filed its "Final Report and Account" is not crucial as the plaintiff contends. Section 55, sub. e of the Bankruptcy Act, 11 U.S.C.A. § 91, sub. e, provides that "Whenever the affairs of the estate are ready to be closed a final meeting of creditors shall be ordered * * *" The affairs of the Match estate were ready to be closed

when the trustee filed its "Final Report * * * and Petition for Allowance" on October 11, 1945. This report complied with the requirements for a final report because along with other information, the trustee set forth receipts, disbursements, and cash on hand, and asked for an allowance. See Form No. 1104, 5 Collier on Bankruptcy 3923 (14th ed., 1954). The creditors were given an opportunity to examine this report and notice of the "final meeting," and they were informed that at this meeting "the trustee's account will be examined, and if found correct, the same will be allowed and an order then or thereafter entered without further notice discharging the trustee of its trust * * *." The creditors appeared at the "final meeting" and failed to object to the trustee's accounts when they were asked if they wished to do so. After allowances and the final dividend had been determined and paid, the trustee filed a short affidavit stating that it had complied with the orders of the Court, showing no balance to its account, and asking that it be discharged. It was not required to give the creditors notice of the filing of this report or to have a meeting at which the creditors could discuss the report. The creditors previously had been given an opportunity at a proper time to discuss everything that there was to discuss. The referee then discharged the trustee of its trust and closed the case, as it was within his power to do. I believe these acts of the referee were legally effective for the purposes intended and in accordance with the law and practice of this Court. See Bankruptcy Act §§ 2, sub. a(8), 38 (6), 11 U.S.C.A. §§ 11, sub. a(8), 66 (6).

The second theory upon which plaintiff seeks to recover is based on In re International Match Corp., 2 Cir., 190 F.2d 458, certiorari denied, 1951, 342 U. S. 870, 72 S.Ct. 113, 96 L.Ed. 655. Plaintiff requests judgment here against the trustee as a corollary of that decision. Plaintiff contends that the Court of Appeals' decision in that case requires the

conclusion that defendant's payments to Ehrhorn were unlawful, and therefore defendant should repay these unlawfully expended sums to plaintiff for the benefit of Match's creditors. Defendant denies that its payments to Ehrhorn were unlawful and argues that, in any event, plaintiff's action against it is barred by the two-year period of limitations under section 11, sub. d of the Bankruptcy Act.

 Since I believe that section 11, sub. d bars this action, it is not necessary for me to determine whether defendant's payments to Ehrhorn were illegal. Section 11, sub. d provides: "Suits shall not be brought against a person who has acted as a * * * trustee of a bankrupt estate, upon any matter arising in connection with the administration thereof, subsequent to two years after the estate has been closed." The Match estate was closed on June 24, 1947 and this action was begun in February 1952, well over the two-year period provided in section 11, sub. d.

Plaintiff contends that section 11, sub. d is not applicable (1) because of the reasoning in Bilafsky v. Abraham, 1903, 183 Mass. 401, 67 N.E. 318, and (2) because defendant's alleged fraud tolled the statute of limitations. Bilafsky v. Abraham, supra, involved a suit by a trustee to recover property allegedly belonging to the bankrupt's estate. The Court reasoned "that the word 'closed' * * * means properly and finally closed, and if, upon proceedings in the court of bankruptcy, it appears that the order closing the estate was made under a mistake, and that an order should be entered reopening the estate for the purpose of having it further administered, it should be held, after the reopening, that the estate is open for the purpose of bringing suits, even though more than two years have elapsed since the entry of the original erroneous order. * * *" 183 Mass. at page 403, 67 N.E. at page 319.

 Kinder v. Scharff, 1913, 231 U.S. 517, 34 S.Ct. 164, 58 L.Ed. 343, casts considerable doubt on the present validity of the Bilafsky case. But it is enough to say that I do not believe that the reasoning in the Bilafsky case should be applied to the instant case which involves a suit against a trustee in bankruptcy for tort liability arising out of its alleged unlawful acts during the administration of an estate. There is no period of limitation for reopening an estate "for cause shown". See Bankruptcy Act, § 2, sub. a(8); Grand Union Equipment Co. v. Lippner, 2 Cir., 1948, 167 F. 2d 958, 961; 1 Collier on Bankruptcy § 2.49, n. 5 (14th ed., 1940). Hence, if the reasoning in Bilafsky were followed, section 11, sub. d would be ineffective to protect a trustee from suits brought more than two years after an estate was closed. This would be contrary to the plain meaning of the section's language. It would also be contrary to the general policy underlying all statutes of limitations for it would suspend a Damocles sword of possible tort liability over the head of any person rash enough to serve as a trustee in bankruptcy. See 1 Collier on Bankruptcy § 11.12, n. 9 (14th ed., 1940). As Mr. Justice Holmes said in Kinder v. Scharff, "* * * it is obvious that there must be some limits if the promise of repose after two years in § 11d is not to be a mirage. * * *" 231 U.S. at page 520, 34 S.Ct. at page 165.

Plaintiff also argues that defendant's alleged fraud tolled the statute of limitations, i. e., section 11, sub. d. Plaintiff relies largely upon Bailey v. Glover, 1875, 21 Wall. 342, 22 L.Ed. 636, and Holmberg v. Armbrecht, 1946, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743. These cases stand for the proposition that federal statutes of limitations do not begin to run until a defrauded person has discovered the fraud or has failed to discover it when he could have done so by the exercise of reasonable diligence. This proposition seems to me to be an eminently sensible one, but when applied to the facts of this case it does not help the plaintiff.

According to plaintiff, defendant's fraud consists of its false representation in its "Final Report * * * and Petition for Allowance" that it held $317,715.21 in a reserve set aside for referee's commissions when it had already paid Ehrhorn $89,500. Plaintiff states that during the period that defendant's "Final Report * * * and Petition for Allowance" was pending before Judge Rifkind, defendant made further payments to Ehrhorn from the reserve and did not inform Judge Rifkind or the creditors that such payments had been made.

■ Certainly defendant could have been more explicit with regard to payments to the referee from the reserve fund. I do not approve of its failure to state how much of the reserve fund had actually been paid to the referee. But the issue before me is not whether I approve of defendant's accounts; it is whether the evidence warrants condemnation of these accounts as fraudulent. In my opinion, the evidence does not warrant the conclusion that defendant's accounts were fraudulent. As I have already indicated, I believe that defendant gave the creditors adequate notice that the amount in the "Reserve set aside representing earned commissions of referee in bankruptcy" was dedicated for payment to the referee and was not considered available for dividend payments to them. Furthermore, the actions of the creditors and the testimony of Realization's president prove that the creditors knew that the trustee considered the amount in the reserve for referee's commissions as belonging to the referee and not available for distribution to them. Since defendant gave the creditors adequate notice, and the creditors were aware of its position as regards the reserve for referee's commissions, defendant's accounts cannot be considered fraudulent.

■ But even if it could be said that the trustee's accounts were fraudulent, this action is barred by section 11, sub. d. The minutes of the meeting of Realization's shareholders held on December 3, 1948 at Pembroke, Bermuda, show that Realization knew then of a possible claim against defendant based on the payments to Ehrhorn.[1]

The two-year period begins to run from that date because Realization or any other creditor could then have moved ex parte to reopen the estate. Thereupon, a trustee could have been elected and he could have brought suit against defendant within two years from December 3, 1948. See In re International Match Corp., 2 Cir., 190 F.2d 458, 461, certiorari denied, 1951, 342 U.S. 870, 72 S.Ct. 113, 96 L.Ed. 655. The fact that Realization chose to follow the course of initiating a proceeding against Ehrhorn and that the other creditors remained quiescent cannot increase the period of time within which suits may be brought against a trustee as provided in section 11, sub. d.

Judgment for defendant.

---

1. The minutes read, at page 5, "Mr. Conroy then reported with respect to a possible claim and law suit against Oscar Ehrhorn, the former Referee in the bankruptcy proceeding of International Match Corporation (and possibly against Irving Trust Company as Trustee in Bankruptcy), based upon the fees paid to Mr. Ehrhorn for his services in that capacity. At the time the final accounts of the Trustee were rendered, it appeared that these fees, while unconscionable, had been determined in accordance with the existing law. Certain facts have since been disclosed by Judges of the United States District Court for the Southern District of New York which indicate that the payments may have been either illegal or unauthorized or fraudulently obtained. The Directors have authorized Messrs. Cadwalader, Wickersham & Taft, American counsel for the Company, to investigate the matter further and if in their opinion a cause of action exists, to proceed with it. It is possible that such an action, if successful, might furnish the Company with working capital for a considerable period of time. He emphasized, however, that it was as yet too early to place any reliance upon such a recovery."